Scott Lynn ROLAND,
Plaintiff–Appellant,

v.

UNITED STATES of America,
Defendant–Appellee.

No. 87–2246.

United States Court of Appeals,
Fifth Circuit.

March 8, 1988.

Frank D. Moore, Cooper, Tex., for plaintiff-appellant.

Janet A. Bradley, Michael L. Paup, Chief, Appellate Section, Tax Div., Roger M. Olsen, Asst. Atty. Gen., Dept. of Justice, William S. Estabrook, William S. Rose, Jr., Acting Asst. Atty. Gen., Washington, D.C., for defendant-appellee.

Before TIMBERS,* KING,** and HIGGINBOTHAM, Circuit Judges.

TIMBERS, Circuit Judge:

Scott Lynn Roland ("Scott") appeals from a judgment entered February 12, 1987 in the Eastern District of Texas, Judith K. Guthrie, *Magistrate*, holding that the Internal Revenue Service rightfully could levy on real property fraudulently conveyed to Scott by his parents to satisfy back taxes owed by his parents. Scott claims that, at the time of the alleged fraudulent transfer, the IRS was not a

* Of the Second Circuit, by designation.

** Formerly Carolyn Dineen Randall.

creditor; his father was not solvent and did not intend to defraud the government; and he had no knowledge of his father's tax problems. We find that the government proved the relevant factor—the father's intent to defraud the government at the time of the transfer. We affirm the judgment of the magistrate.

## I.

We shall summarize only those facts believed necessary to an understanding of the issue raised on appeal.

In 1976 and 1977, the Internal Revenue Service assessed tax deficiencies against Charles and Renee Roland ("Charles and Renee" or "the Rolands"), the parents of Scott, for the taxable years 1975 and 1976. In 1977, Charles and Renee established a chapter of the Life Science Church—a "church" existing solely on paper. Charles took a "vow of poverty" and gave all his assets to the "church". In a deed dated April 3, 1978, Charles and Renee transferred legal title to a home they owned in Irving, Texas ("Irving property") to themselves and to Scott, then 15 years old, as trustees for the church. Scott was unaware of the transfer. The deed was recorded April 18, 1978. Scott paid no consideration.

In October 1980, the Rolands sold the Irving property. To satisfy its liens for the 1975 and 1976 deficiencies, the IRS took a portion of the proceeds. The leftover balance of $8,028.20 from the sale was distributed to the Rolands.

Those proceeds were used to purchase another property near Detroit, Texas ("Detroit property"). The contract of deed refers to Scott, then 18 years old, as the buyer. At the closing on November 1, 1980, Charles signed Scott's name to the pertinent documents. Scott's true signature appears only on the contract of deed, signed subsequent to the closing.

Since the closing, Charles and Renee have lived continuously at the Detroit property, while Scott remained in Irving to finish high school. After graduating in 1981,

Scott only occasionally lived with his parents. Charles and Renee made the mortgage payments directly to the seller. They also either paid or helped Scott pay the taxes, the utility bills, and the insurance on the property. Scott never reported any rental income on his tax returns.

In March 1983, the IRS issued Charles and Renee another notice of deficiencies for the 1977, 1978 and 1979 taxable years. For these years, Charles and Renee had not filed tax returns which were due on April 15 of each of the following years. The Tax Court dismissed their petition for redetermination on March 30, 1984 for failure to prosecute. On August 16, 1984 the IRS assessed the additional tax deficiencies.

The instant grievance arose when, in June and July of 1985, the IRS posted a notice of seizure and levied on the Detroit property, as well as on personal property, to satisfy the back taxes owed.

Scott then commenced the instant action in the federal district court for injunctive relief, for damages, and for removal of the lien. By agreement of the parties, the case was referred to Magistrate Guthrie. At trial, Charles admitted, when asked why he did not want any property in his name, that

> "I had decided some time prior that I did not want to own any real estate or tangible assets.... [b]ecause of the conflict that I had had with the internal revenue."

Scott testified that the property belonged solely to him; that, prior to the sale of the Irving property, his parents gave him a portion of the equity; that the down payment for the disputed property came from his share of the proceeds of the sale; that his father was acting as his agent; and that he, Scott, had an oral agreement to rent the property to his parents for an amount equal to the mortgage payments.

The magistrate was not persuaded by Scott's claims. In a memorandum opinion filed February 13, 1987, she upheld the government's right to levy on the property.[1] She held that the initial transfer of

---

1. The magistrate did hold that the personal property was wrongfully levied upon. The government did not appeal from this holding.

the Irving property to the Rolands and Scott as "trustees" for the church was intended to defraud the government which was a creditor at the time of the conveyance. Since the proceeds from the sale of that property were used in part to purchase the disputed Detroit property, she further held that Charles retained his interest in that property upon which the government could levy.

This appeal followed.

## II.

The sole issue before us is whether the court properly held that the government rightfully could levy on the property as proceeds of a fraudulent conveyance.

■ Federal law governs the right of the United States to enforce a tax lien, but state law determines the taxpayer's interest in the property to which the lien attached. *Aquilino v. United States*, 363 U.S. 509, 513–14 (1960). Neither party disputes that at the time of the alleged fraudulent transfer, the controlling statute was Section 24.02 of the Texas Fraudulent Transfers Act, Tex.Bus. & Com.Code Ann. (Vernon 1968). Section 24.02(a) provides, generally, that a transfer of property is void with respect to a creditor if the transfer was intended to delay, hinder or defraud that creditor from obtaining "that to which he is, or may become, entitled." [2] In *United States v. Chapman*, 756 F.2d 1237 (5th Cir.1985), we applied this statute in a similar factual setting. In *Chapman*, the IRS had obtained judgment against a taxpayer, an admitted heavy gambler, and sought execution against real property it alleged belonged to the taxpayer. The tax-

payer asserted that the property belonged to his daughter. The taxpayer had conveyed his residence to his 19 year old son for no consideration except assumption of the mortgage, an amount far less than its value. The son subsequently conveyed the property to his sister, then age 18, for a nominal sum. Throughout this period, the taxpayer and his wife continued to live on the property and to make the mortgage payments purportedly in lieu of rent. A few years later, the sister, who had no appreciable income at the time, exchanged the residence and cash for another piece of property. The parents lived on this property and made the mortgage payments. Utility services were provided in the taxpayer's name. The taxpayer made substantial improvements to the property. This property was at the heart of the dispute. The IRS was not a creditor when the first property was exchanged for the second property.

At trial, the taxpayer and his family testified that the purpose of the transfer to his children was to protect the family against losing property from his gambling activities.

■ We held that under the Texas Fraudulent Transfers Act the debtor's intent at the time of the conveyance was the crucial element. *Chapman, supra*, 756 F.2d at 1241; *see also Stout v. Clayton*, 674 S.W.2d 821, 826–27 (Tex.Civ.App.1984). A *subsequent* creditor could reach a grantor's interest in property conveyed to others if that transfer was made with intent to defraud that particular creditor. *Chapman, supra*, 756 F.2d at 1242. Since direct proof of fraud often is not available, courts may rely on circumstantial evidence to es-

---

2. Tex.Bus. & Com.Code Ann. § 24.02 (Vernon 1968) (current version at Tex.Bus. & Com.Code Ann. §§ 24.005, 24.009 (Vernon 1987)) provides:
   "(a) A transfer of real or personal property, a suit, a decree, judgment, or execution, or a bond or other writing is void with respect to a creditor, purchaser, or other interested person if the transfer, suit, decree, judgment, execution, or bond or other writing was intended to (1) delay or hinder any creditor, purchaser, or other interested person from obtaining that to which he is, or may become, entitled; or

   (2) defraud any creditor, purchaser, or other interested person of that to which he is, or may become, entitled.
   (b) The title of a purchaser for value is not void under Subsection (a) of this section unless he purchased with notice of
   (1) the intent of his transferor to delay, hinder, or defraud; or
   (2) the fraud that voided the title of his transferor."

tablish the fraudulent intent. *Id.* at 1240–41; *Williams & Chastain v. Laird,* 32 S.W.2d 502, 505 (Tex.Civ.App.1930).

Based on the admission of the taxpayer at trial regarding his desire to keep his assets beyond the reach of the IRS and based on other indicia of fraud, we affirmed the district court's finding of fraud as not clearly erroneous.

When several of these indicia of fraud are found, they can be a proper basis for an inference of fraud. *Chapman, supra,* 756 F.2d at 1243; *United States v. Fernon,* 640 F.2d 609, 613 (5th Cir.1981). Such indicia of fraud, we stated, include (1) the debtor's transfer of valuable property without consideration; (2) a close personal relationship between the parties to the conveyance; (3) the debtor's retention of possession and indicia of ownership of the property; and (4) the debtor's transfer of all of his property, especially if to different members of his family, leaving him unable to pay his debts. *Chapman, supra,* 756 F.2d at 1243 n. 4.

### III.

We turn now to the application of these principles to the facts of the instant case.

■ Under the intent test referred to above, whether Charles was solvent at the time of the transfer is not dispositive. The crucial element was his *intent* at that time. We are satisfied that the magistrate was not clearly erroneous in finding that Charles intended to defraud the IRS. He made admissions similar to those made by the taxpayer in *Chapman.* Scott paid no consideration for the initial transfer. Although Charles and Renee asserted that their mortgage payments were in lieu of rent, Scott never reported rental income on his tax returns. Indeed, the only significant indicium of fraud lacking in the instant case and found in *Chapman* was that the Rolands did not transfer all of their assets. When viewed in the context of all of the other indicia of fraud present, how-

ever, this difference does not suffice to distinguish *Chapman.*

The government indisputably was a creditor on April 15, 1978 when Charles and Renee failed to file a tax return for the taxable year 1977. Assuming arguendo Scott's assertion that the initial transfer to the trust (later converted into the property at issue) occurred on April 3, 1978 when the papers were signed—before the government became a creditor—the government nevertheless sustained its burden of establishing that the transfer was intended to defraud it as a future creditor.[3] The government therefore was entitled to levy on the conversion of that property into other property. *Chapman, supra,* 756 F.2d at 1241.

■ Finally, we reject Scott's argument that his lack of knowledge of his father's intent to defraud the IRS defeats the lien. Scott was not a purchaser for value—the element necessary to make his lack of knowledge a relevant consideration. Tex. Bus. & Com.Code Ann. § 24.02(b); see *supra* note 2.

### IV.

To summarize:

We hold that the magistrate was not clearly erroneous in finding that, under the controlling Texas statute, Charles Roland had an interest in the disputed property that the IRS could attach. Based on his admissions at trial and the other indicia of fraud present, the magistrate had sufficient evidence on which to base a finding of fraudulent intent.

AFFIRMED.

---

**3.** Moreover, the government argues persuasively that under relevant Texas law it was a present creditor. Although the deed is dated April 3, 1978, Scott was unaware of the transfer. Thus

his acceptance did not occur until the deed was recorded on April 18, 1978, after the government became a creditor.